DE LOACH vs. HARDEE'S SON & COMPANY.

Where suit is brought for the purchase money for fertilizers on a contract containing this stipulation: "which said note is given for forty-one hundred pounds of fertilizer known as the Sea Fowl Guano, valued at this date at $143.50, which I buy and accept from N. A. Hardee's Son & Co., entirely upon its analytical standard, they in no case to be held responsible for the practical results:"

Held, 1. That evidence by a chemist who applied the test of analysis to a sample of the fertilizer, and who testified from his analysis that it did not come up to the analytical standard of such fertilizer, is admissible, though his analysis was imperfect, and the condition of the sample as to its preservation unknown to the chemist, and the date of the analysis was not given—such evidence being competent, and its effect being for the jury to pass upon in connection with other evidence which might have been introduced to supply its want of sufficiency to make a complete defense.

2. That testimony in respect to the practical result of its application to defendant's crop, while inadmissible by the terms of the contract to hold plaintiffs responsible, standing alone, yet may be admitted to throw light upon the true issue, whether or not the fertilizer delivered actually came up to the analytical standard stipulated in the contract.

Evidence. Contracts. Before Judge FLEMING. Bulloch Superior Court. April Term, 1879.

To the report contained in the opinion it is only necessary to add the following:

A witness for defendant, Dr. Lane, testified as follows: "Am a physician and chemist, and competent to make chemical analysis. I analyzed the sample of fertilizer brought to me by defendant, of which he has spoken. Subjected it to chemical tests to find out principally the portion of insoluble matter in it, and to find out the presence of the usual fertilizing ingredients of the fertilizer. The test was perfect for discovering the insoluble matter which is wholly unfertilizing. I found eighty-five per cent. of sand and other matter wholly insoluble, and fifteen per cent. of soluble matter. I found only a trace of ammonia, not, in my opinion, an amount equal to two per-cent, nor anything like that. I cannot swear to the quantity of ammonia precisely, because I had no way of measuring the quantity accurately, not being fitted up for that. But I did test it so as to discover its presence and found only a trace. I found also phosphoric acid in it, but did not test the quantity; neither that nor the ammonia was left in the insoluble matter.

"The analytical standard of the Sea Fowl Guano is, as specified in the report of the commissioner of agriculture of the state, viz: moisture, 15.65; phosphoric acid. insoluble 3.13; do. soluble, 5.66; reverted, reduced or precipitated, 3.30; ammonia, 2.91. This sample, so analyzed by me, did not come up to this by a great deal.

"The process I adopted for this analysis was this: I took 120 grains, placed it in a glass tube, and poured over

it a solution of sulphuric acid, and let it remain so three days, then poured the acid off, washed the remainder out carefully with alcohol and rain water, preserving all the insoluble matter, which I dried on paper thoroughly dry in the sun, and weighed it. It weighed 102 grains. Before separating the soluble from the insoluble matter, after the mass had remained three days in the glass tube, I tested it for ammonia by dipping in the solution litmus paper, which is the test for ammonia, and found only a trace of it.

"I am a farmer as well as physician and chemist, and have used fertilizers largely for many years on my own crops. I have used many kinds, and it has been my habit to analyze the various fertilizers used by me in the manner aforesaid to determine the quantity of insoluble matter in them, for insoluble matter is not fertilizing, and does no good, except to act as a body to hold the soluble matter. I used the Sea Fowl Guano on my crop last year. I analyzed a sample of it to find the insoluble matter. It came up to the standard I have spoken of, and proved to be a good fertilizer in its results upon my crop. This sample I analyzed for De Loach has immensely more insoluble matter than was shown by the same test to be in the sample I analyzed for myself. The fertilizer I analyzed for De Loach would be worthless as a fertilizer. That is to say there are some fertilizing properties in it in the shape of soluble matter, as I have testified, which of course would produce results upon land, but it would have to be used in immensely large quantities. The application of 150 to 300 pounds (the usual quantity) to an acre would be of little or no service. 2000 pounds to the acre might produce well. But a fertilizer requiring to be used in that quantity is not a first-calss fertilizer. It is not such a fertilizer as would sell for $65.00 or $70.00 a ton on credit. The usual quantity of good fertilizer used upon land in this county is 150 to 200 pounds per acre."

In reply to questions by the court, the witness said: "I cannot swear whether or not there was in the fertilizer

which I analyzed 15.65 moisture, nor if there was phosphoric acid insoluble 3.13, or soluble 5.66, or reverted, reduced or precipitated 3.30, or ammonia 2.91. I was not prepared, and did not test for any of these chemicals, except for the ammonia, and of that I found some, but not, in my opinion, as much as 2.91. But I cannot swear there was not that much. After dipping some paper in the ammonia I poured the solution on the ground, and then dried and weighed the remains. These remains appeared to be sand, but I made no test except by the eye. There were one hundred and twenty grains of the fertilizer put in the glass tube, and one hundred and two grains of what *looked like sand*, when I had finished the experiment. This left about eighty-five per cent. of insoluble matter. This is the reason I say that the fertilizer does not come up to the standard."

On motion of plaintiffs' counsel, all this evidence as to the analysis was ruled out.

Defendant also offered to testify as to the effect of this fertilizer on his crops, which the court refused to allow. Both these rulings were complained of as error.

Rufus E. Lester; D. R. Groover, for plaintiff in error.

T. W. Oliver, Jr., by brief, for defendants.

Jackson, Justice.

This action is based upon a contract to pay $143.50 for a certain quantity of Sea Fowl Guano. The jury found for the plaintiffs, much of defendant's testimony having been ruled out by the court. He moved for a new trial on the ground that it was so ruled out, and also on the ground of newly discovered evidence. The motion was overruled, and the defendant excepted.

1. The contract contained the following stipulation: "Which said note is given for 4,100 pounds of fertilizer known as the Sea Fowl Guano, valued at $143.50, which I buy and accept from N. A. Hardee's Son & Co., entirely

upon its analytical standard, they in no case to be held responsible for the practical results."

It will thus be seen that the only issue which defendant could make was this: Did the guano come up to the analytical standard bargained for? He put in a plea that it did not come up to the standard bargained for, and was therefore not the article which he agreed to pay for, and was worthless.

This plea he had the right to make good by legal and competent proof; and upon the competency of that proof the court is to judge: upon its sufficiency, the jury; or the court, on motion for a non-suit, or for a new trial. The court here excluded the evidence from the jury, and the question is, was the rejection of it right?

A doctor and chemist swore that he had analyzed the guano—that its analytical standard was to be of such and such ingredients according to the report of the Georgia commissioner of agriculture, and that this guano by sample furnished him by the defendant, did not, by a great deal, reach that standard. What the true standard was seemed to have been agreed upon tacitly—no objection being made to the mode of ascertaining it from the commissioner's report; but the chemist had not perfectly analyzed the sample, as appeared from questions put by the court, and could not swear exactly to the component parts of the guano, though he did swear that the soluble matter, which is the only fertilizing quality, was, by a great deal, less than the standard.

We think that his testimony was competent and admissible for what it was worth. Whether sufficient by itself to authorize a verdict, is not the question. It might have been aided by other testimony. The main defect in it, it strikes us, is that it does not appear whether the sample analyzed had been preserved in such manner as to insure that it was a fair sample of the guano when delivered. The ammonia would have evaporated, and much of the fertilizing properties of the manure been lost, had it not been so preserved. It was therefore important to show

when it was analyzed by Dr. Lane, and where and how kept until that time.

But all this might have been supplied by questioning the witness or by other witnesses, and relates more to the sufficiency and effect of evidence than to its admissibility.

On the whole, we think it admissible, to be passed upon by the jury under the charge of the court. See *Allen vs. Young,* last term, not yet reported ; 51 *Ga.*, 298; 53 *Ib.*, 635.

In the case of *Allen vs. Young,* the stipulation is very similar to this, and there this court held that "the precise right of the purchaser was to receive an article containing the chemical and fertilizing properties enumerated in the guaranty, and these in the proportions and up to the degree of strength held out as a standard," and we further say that the best mode to arrive at it is to test a sample by analyzing it, due care being had to preserve a sample in order to insure its fairness. "Test or comparison by indirect means might be practicable, too," we go on to say in the syllabus of that case.

So that that case would seem to strengthen the view we take of this.

So in the case in 53 *Ga.*, 637, it is ruled that the opinion of a chemist after analysis is evidence to be considered by the jury—not conclusive, of course—but, nevertheless, evidence.

2. While, by the express terms of his contract the defendant cannot plead that the practical result of the use of the guano was that it made nothing, and defend himself on that ground, and therefore cannot introduce evidence for that purpose ; yet such evidence is admissible to strengthen the testimony of the chemist that the guano did not come up to the stipulated standard, and to show that by its failure to meet the standard agreed upon, the defendant was damaged. If it came up to the stipulated standard, it is wholly immaterial whether it made a lock of cotton or grain of corn ; but the fact that it made neither is evidence

that it did not come up to that standard, especially where the evidence is, as in this case, that other Sea Fowl Guano which came up to the standard, or nearly so, did help the production largely.

And this view seems, too, to accord with the ruling in *Allen vs. Young*, last term, where we say on a similar contract, or intimate, at least, that the effect on crops could be considered in connection with the admission of the seller made on the trial.

The ground of newly discovered testimony was not pressed.

We think, however, that the case had better be tried over, in accordance with the views given above. It may be that the result will be the same before the jury. That should depend much upon the preservation of the sample analyzed as a fair sample of the manure sold; but the defendant's evidence was improperly excluded, and this entitles him, as it went to the vitals of his case, to a new trial.

Judgment reversed.